# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 17-5169-GW(FFMx) | Date | March 5, 2020 |
|---|---|---|---|
| Title | *Cedars Sinai Medical Center v. Quest Diagnostic Incorporated* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Terri A. Hourigan | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Edward G. Poplawski | Christopher S. Ruhland |
| Lisa D. Zang | Anna Q. Do |
| | Jonathan D. Loeb |

**PROCEEDINGS:**   **PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OF TRADE SECRET MISAPPROPRIATION AND BREACH OF CONTRACT AND MOTION FOR NEW TRIAL [509]**

The Court's tentative ruling is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, Plaintiff's Motion is TAKEN UNDER SUBMISSION. Court to issue ruling.

|  | : | 20 |
|---|---|---|
| Initials of Preparer | JG | |

*Cedars-Sinai Medical Center v. Quest Diagnostics, Inc.*; Case No. 2:17-cv-05169-GW-(FFMx)
Tentative Ruling on Motion for Judgment as a Matter of Law and for a New Trial

## I.      Background

Plaintiff Cedars-Sinai Medical Center ("Cedars-Sinai") brought this action against Defendants Quest Diagnostics, Inc. and Quest Diagnostics Nichols Institute (collectively, "Quest") for: (1) misappropriation of certain trade secrets regarding the development of a certain diagnostic test in violation of the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836; (2) misappropriation of those trade secrets in violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426; and (3) breach of contract, specifically a "Confidentiality Agreement." *See* Final Jury Instructions ("Instructions") at 1, Docket No. 484.

Cedars-Sinai's allegations stem from its discovery that the detection of particular antibodies above control levels – including anti-vinculin and "anti-CdtB" antibodies – indicates the presence of Irritable Bowel Syndrome ("IBS"). *See generally* Stipulated Facts read to the jury, Exhibit 1000, 9/11/19 Reporter's Transcript, Docket No. 502 at 87-91.  That discovery led to a breakthrough in diagnostic testing for IBS, which Cedars-Sinai tried to capitalize on by engaging in discussions with Quest (among other companies) about a potential license for Quest to commercialize Cedars-Sinai's IBS diagnostic technology.  *Id.*  The parties entered into a "Confidentiality Obligations" agreement to facilitate those discussions whereby Cedars-Sinai disclosed "confidential details" about the diagnostic technology.  Ultimately, however, the parties did not enter into a licensing agreement.  *Id.*  Later, Cedars-Sinai discovered that Quest was performing an IBS diagnostic test under the trademark "IBSDetex."

The action was tried before a jury for nine days.  On September 13, 2019, the jury returned a verdict for Defendants, finding them not liable for trade secret misappropriation or breach of contract.  *See* Verdict, Docket No. 486.  On September 20, 2019, the Court entered judgment in the action.  *See* Judgment, Docket No. 494.

On October 18, 2019, Plaintiff moved for judgment as a matter of law and for a new trial. *See* Motion for Judgment as a Matter of Law and for a New Trial ("Motion), Docket No. 509. Defendants opposed the motion.  *See* Opposition to Motion ("Opp'n"), Docket No. 511.  Plaintiff replied.  *See* Reply in Support of Motion ("Reply"), Docket No. 512.

## II.    Legal Standard

### A.   Judgment as a Matter of Law

Under Rule 50(a) and (b), a court may enter judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [prevailing] party" as to an issue on which that party has been fully heard during trial.  Fed. R. Civ. P. 50.  A party seeking judgment as a matter of law has a "very high" standard to meet.  *Costa v. Desert Palace*, 299 F.3d 838, 859 (9th Cir. 2002).  The jury's verdict must be upheld if, viewing the facts in the light most favorable to the nonmoving party, there is sufficient evidence for a reasonable jury to have found in the nonmoving party's favor.  *Johnson v. Paradise Valley Unified Sch. Dist*., 251 F.3d 1222, 1227 (9th Cir. 2001); *Omega Envt'l, Inc. v. Gilbarco, Inc*., 127 F.3d 1157, 1161 (9th Cir. 1997) ("Judgment as a matter of law is appropriate when the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, which is contrary to the jury's verdict."), *cert. denied*, 525 U.S. 812 (1998); *see also Baker v. Delta Air Lines, Inc*., 6 F.3d 632, 644 (9th Cir. 1993) ("[A court] must determine whether the evidence, considered as a whole and viewed in the light most favorable to the nonmoving party, reasonably can support only a verdict for the moving party.") (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992)).

In considering a motion under Rule 50(b), the district court is not free to weigh the parties' evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury.  *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 150 (2000); *Lytle v. Household Mfg., Inc*., 494 U.S. 545, 554-55 (1990); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 254 (1986); *Continental Ore Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690, 696 n.6 (1962); *Baker*, 6 F.3d at 644.

### B.   New Trial

Under Federal Rule of Civil Procedure ("Rule") 59(a), a court may grant a new trial on all or some of the issues after a jury trial "for any reason for which a new trial has been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1).  Courts are thus "bound by those grounds that have been historically recognized" for a new trial, including claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving."  *Molski v. M.J. Cable, Inc*., 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).

In contrast to a motion for judgment as a matter of law, a judge considering a motion for new trial "can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). Nevertheless, "a decent respect for collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter." *Id*. (citation omitted). If, on the other hand, having given full respect to the jury's findings and having reviewed the entire evidence, the judge "is left with the definite and firm conviction that a mistake has been committed," a new trial should be granted. *Id*. at 1372 (citation omitted); *see also EEOC v. Pape Lift, Inc*., 115 F.3d 676, 680 (9th Cir. 1997) (declaring that motion for new trial should only be granted if verdict is against great weight of evidence or it is quite clear that jury has reached seriously erroneous result); *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001) ("[E]ven if substantial evidence supports the jury's verdict, a trial court may grant a new trial if 'the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'") (quoting *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999)).

## III.   Discussion

### A.  Rule 50 Motion

As a threshold matter, Defendants argue that Plaintiff's Rule 50(b) motion is barred because Plaintiff failed to file a prerequisite Rule 50(a) motion. *See* Opp'n at 2. A party may only bring a post-verdict Rule 50(b) motion if it previously brought a Rule 50(a) motion after the close of evidence. *See, e.g., Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003); *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1345 (9th Cir. 1985). Such a Rule 50(a) motion "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a). However, Rule 50(b)'s prerequisite "may be satisfied by an ambiguous or inartfully made motion" under Rule 50(a). *See Reeves v. Teuscher*, 881 F.2d 1495, 1498 (9th Cir. 1989).

Here, after the close of evidence, Plaintiff's attorney stated: "I wanted to inquire about the Court's preference regarding [JMOLs]. We want to put on the record that we're moving for [JMOL] on liability, and I didn't know what the Court's preference was." Ex. 44, 09/11/19 Tr.,

Docket No. 509-56, 84:8-11.[1]  The Court responded: "I've already indicated that I'm not going to grant – at this point in time, I think there is something for the jury to go and review.  And so, I will deny it without prejudice."  *Id.* at 84:12-15.

The Court would find Plaintiff's pre-verdict motion for judgment as a matter of law sufficient to serve as a predicate for the present Rule 50(b) motion.  While it did not a submit a formal motion, Plaintiff clearly stated that it was moving for JMOL, and it identified the grounds on which it was moving – liability.  *See id.*  As the Ninth Circuit explained in *Reeves*, "[a]lthough courts construe strictly the requirement that a motion be made after a case-in-chief, they are generally more liberal about what suffices as a motion for a directed verdict after the close of all the evidence."  *Reeves*, 881 F.2d at 1498 (finding prerequisite satisfied when counsel attempted to move for a directed verdict after the close of evidence, but the court interrupted and told them to renew their motion after the verdict).  "Absent such a liberal interpretation, 'the rule is a harsh one.'"  *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quoting *Nat'l Indus., Inc. v. Sharon Steel Corp.*, 781 F.2d 1545, 1549 (11th Cir. 1986)).

### B.  Misappropriation of Trade Secrets 1 and 3

Plaintiff argues that JMOL or a new trial should be granted because the great weight of the evidence shows that Quest misappropriated Plaintiff's trade secrets.[2]  Specifically, Plaintiff argues that the evidence compels the conclusion that Defendants misappropriated Trade Secrets 1 and 3.  Trade Secret 1 is defined as "identification of Creative Biomart of Shirley, New York as the source of the CdtB 01C antigen used in Cedars's IBS diagnostic assay."  Instructions at 5.  Trade Secret 3 is defined as "clinical study data and results regarding validation and verification of IBS diagnostic assay."  *Id.*  Plaintiff alleges that Defendants misappropriated these trade secrets after Cedars-Sinai's Dr. Nirdesh Gupta sent a Confidential Manuscript containing Trade Secrets 1 and 3 to Quest's Luke Fleckenstein.  *See* Motion at 6.

In order to win on its misappropriation claims, Plaintiff had to prove the following elements:

---

[1] All numerically named exhibits are Cedar-Sinai's and are available at Docket No. 509.  Alphabetically-named exhibits are Quest's and are available at Docket No. 511.

[2] As discussed above, the standard for JMOL is whether the evidence only permits a conclusion contrary to the jury's verdict.  *Omega Envt'l*, 127 F.3d at 1161.  The standard for a new trial is whether the "great weight" of evidence is contrary to the jury's conclusion.  *Pape Lift*, 115 F.3d at 680.  Because the new trial standard presents a lower hurdle than the JMOL standard, the Court will use the new trial standard throughout this opinion, unless application of the JMOL standard would lead to a different result.

1. That it owned the identified item claimed to be a trade secret that was supposedly misappropriated;
2. That the item was indeed a trade secret at the time of its misappropriation
3. That Quest improperly used the trade secret
4. That Cedars was harmed or Quest was unjustly enriched by the improper use; and
5. That Quest's use was a substantial factor in causing Cedars's harm or Quest's being unjustly enriched.

*See* Jury Instructions at 5.  The jury found that Plaintiff had satisfied its burden of proving that Trade Secrets 1 and 3 were trade secrets.  *See* Verdict at 1, 2.

### 1.   Whether Cedars-Sinai Owned the Trade Secrets

The first question is whether Cedars-Sinai has proven by the great weight of the evidence that it owned the trade secrets.  Defendants argue that Plaintiff has only shown that it possessed, not that it owned, the trade secrets in question.  *See* Opp'n at 5-6.  However, the Court has already held that possession is sufficient to assert a trade secret claim as long as secrecy is maintained.  *See* Minutes of Hearing on Motion for Summary Judgment, Docket No. 350, at 8 (relying on *DTM Research, L.L.C. v. AT&T Corp.*, 245 F.3d 327 (4th Cir. 2001)); *see also Integral Dev. Corp. v. Tolat*, 675 F. App'x 700, 702 (9th Cir. 2017).  Here, Defendants argue that Plaintiff did not actually own Trade Secrets 1 and 3, but Defendants do not appear to contest that Plaintiff at least possessed Trade Secrets 1 and 3.  The Court concludes that the great weight of the evidence shows that Cedars-Sinai satisfied the first prong of its trade secret misappropriation claim.

### 2.   Whether Trade Secrets 1 and 3 were Trade Secrets at the Time of Misappropriation

The next factor Cedars-Sinai had to prove was that Trade Secrets 1 and 3 were trade secrets at the time of the alleged misappropriation.  The jury found that Cedars-Sinai had carried its burden of proving that Trade Secrets 1 and 3 were trade secrets.  *See* Verdict at 1, 2.  The parties appear to agree that Trade Secrets 1 and 3 were trade secrets from September 11, 2014, when Quest received the manuscript from Cedars-Sinai, to May 13, 2015, when the trade secrets were published.  Quest argues that Cedars-Sinai has not proven by the great weight of the evidence that Trade Secrets 1 and 3 were trade secrets *at the time* of the alleged misappropriation − in other words, that any alleged misappropriation did not occur until after Trade Secrets 1 and 3 were published and no longer trade secrets.  The Court agrees with Cedars-Sinai that this question is more properly addressed below, in the prong regarding whether Quest improperly used the Trade Secrets.  Here, the Court will not revisit the jury's conclusion that Cedars-Sinai carried its burden

of proving that Trade Secrets 1 and 3 were trade secrets.

### 3. Whether Quest Improperly Used the Trade Secrets

A central question in this case was whether Quest improperly used the Trade Secrets between receiving them on September 11, 2014 and their publication on May 13, 2015. Quest obtained the Trade Secrets on September 11, 2014, when Cedars-Sinai employee Dr. Nirdesh Gupta emailed a confidential manuscript, authored primarily by Cedars-Sinai employee Dr. Pimentel, to Quest employee Luke Fleckenstein during licensing discussions for an IBS test. Ex. 2, PTX-0264, Docket No. 509-5, at -0798. The manuscript contained Trade Secrets 1 and 3, as it identified a CdtB protein sold by Creative Biomart (CdtB-01C) as the specific CdtB to be used in the IBS blood test and contained clinical study data and results establishing validation and verification of the IBS test. *Id.* at -0808, -0822-29. On December 23, 2014, Quest terminated licensing discussions with Cedars-Sinai. Ex. 1, Docket No. 509-4, at 119:7-120:4. On December 24, 2014, Quest's former Medical Director, Dr. Naides identified the IBS test as a "priority opportunity[y]" for Quest. Ex. 6, PTX-0078, Docket No. 509-9, at -4962. Cedars-Sinai argues that the circumstantial evidence permits no other conclusion than that Quest improperly used the Trade Secrets while they were protected. While Cedars-Sinai points to a variety of evidence supporting its arguments, this is evidence that the jury was free to weigh as it chose. For all the evidence that Cedars-Sinai musters in its favor, Quest points to evidence on which the jury could have relied to reach a different conclusion. For that reason, the Court would find that Cedars-Sinai has not carried its burden of proving that the great weight of the evidence compels a conclusion in favor of Cedars-Sinai. The Court will walk through the conflicting evidence put forward by the parties below.

#### i. *Planning, Preparation, and Development of IBS Test in December 2014*

Quest began preparations to develop an IBS test in December 2014, soon after terminating licensing discussions with Cedars-Sinai. Cedars-Sinai points to the planning, preparation, and development of this test as circumstantial evidence that Quest was improperly using the Trade Secrets. Specifically, Cedars-Sinai points to a number of factors as evidence that Quest improperly used the Trade Secrets beginning in December 2014.

After Dr. Naides identified development of an IBS test as a "priority opportunit[y]" for Quest, the IBS test began progressing through Quest's "Idea to Market Pipeline" process. Ex. 5, 9/05/19 Tr., Docket No. 509-8, at 50:4-51:12; Ex. 21, PTX-0216, Docket No. 509-27, at -8646.

The Idea to Market Pipeline had five stages, or "gates": (1) "Idea," (2) "Proposal," (3) "Solution Brief," (4) "Launch Readiness," and (5) "Launch." *Id.* In January 2015, Dr. Naides sent emails about ""estimat[ing] costs per sample to run 2 ELISAs, one on antibody to CDT-B," where CdtB "can be bought commercially." Ex. 11, PTX-079, Docket No. 509-14, at -4234; Ex. 5, 0/05/19 Tr., Docket No. 509-8, at 52:15-54:4. The purpose of this inquiry was to determine Quest's financial ability to move forward with the IBS project. *Id.* Because Creative Biomart was the only commercial vendor of the type of CdtB used for the IBS test, Plaintiff's expert opined that Dr. Naides' email must have been relying on Trade Secret 1, the identification of Creative Biomart's CdtB 01C as the type of CdtB to be used in the IBS test. Ex. 3, 9/06/19 Tr., Docket No. 509-6, at 51:15-52:1.

By June 2015, the IBS test had cleared the third gate and was entering the "Launch Readiness" phase. Ex. 5, 9/05/19 Tr., Docket No. 509-8, at 50:4-51:12; Ex. 21, PTX-0216, Docket No. 509-27, at -8646. This meant that Quest had created a "Solution Brief" for the IBS test, a document describing "the test that Quest wanted to develop, how Quest wanted to develop the test, and how Quest want[ed] to market it." Ex. 9, 9/09/19 Tr., Docket No. 509-12, at 94:22-95:8. Cedars-Sinai argues that the fact that Quest reached the "Launch Readiness" stage in six months demonstrates that Quest must have been relying on the Trade Secrets; in contrast, it took Dr. Pimento 10-15 years to develop the IBS test. *See* Reply at 10.

While it is true that the jury could have weighed this circumstantial evidence to reach the outcome Cedars-Sinai desires, Quest provides rebuttal evidence that the jury equally could have used to reach the outcome it did. First, Quest points out that nothing in the document containing the "Idea," "Proposal," and "Solution Brief" stages for the IBS test references Cedars-Sinai's Trade Secrets. Ex. N, DX-1150, Docket No. 511-15, 15 -9288; Ex. L, 9/09/19 Tr., Docket No. 511-13, at 47:2-17. Similarly, the Quest employees who prepared and reviewed the document − Ms. Ray, Dr. Naides, and Mr. Plewman − stated that they did not use Cedars-Sinai's Trade Secrets. Ex. O, 9/05/19 Tr., Docket No. 511-16, at 218:16-25; Ex. G, 9/05/19 Tr., Docket No. 511-8, at 79:21-24, 80: 21-81:3; Ex. L, 9/09/19 Tr., Docket No. 511-13, at 46:23-47:1. Instead, according to Quest's witnesses, "[a]ll the information [they needed] was in the public domain." Ex. L, 9/09/19 Tr., Docket No. 511-13, at 46:23-47:1. Quest points out that Dr. Pimentel's public presentations and publications had already placed the idea of testing for IBS using CdtB in the public domain, and that Quest only relied on this information in developing the idea for its IBS

test. *See, e.g.*, *id.* at 43:7-18; Ex. Q, PTX-160, Docket No. 511-18, at -3236. Therefore, while the identification of Creative Biomart's CdtB 01C was a trade secret at the time Quest's IBS test idea was passing through the Idea to Market Pipeline, the use of CdtB measurements to test to IBS was already public domain by that time. *See, e.g.*, Ex. C, 9/04/19 Tr., Docket No. 511-4, at 24:4-26:2. In fact, Dr. Pimentel acknowledged that two of his patent applications and a multitude of research papers published before September 11, 2014 involved measuring CdtB in relation to IBS. *See id.* at 27:13-16, 29:3-9, 33:14-16, 34:2-8, 36:18-37:20; Ex. U, 9/03/19 Tr., Docket No. 511-22, at 130:24-131:3.

As to the speed with which Quest reached the "Launch Readiness" stage for the IBS test, Quest argues that the evidence showed that Quest actually did not prioritize the IBS test. *See* Opp'n at 11. While Dr. Naides identified the IBS test as a "priority opportunit[y]," he did not actually have authority to approve development of new tests − that power lay with the "Solution Priority Council." *See* Ex. G, 9/05/19 Tr., Docket No. 511-8, at 78:23-79:2. Quest also points out that the Solution Priority Council did not approve the IBS test project until June 12, 2015, a month after the article containing the Trade Secrets was published in PLOS One. *See id.* at 79:3-8. Further, Quest points to testimony from Quest employee Dr. Robinson stating: "Quest simply had no development activity after being provided the draft manuscript. They were evaluating taking a license, but they didn't do anything. They did no experiments. There was no development activity."[3] Ex. H, 9/10/19 Tr., Docket No. 511-9, at 243:2-244:11. Quest's witnesses explained that a Solution Brief is a minor matter that can be created in a matter of weeks, and that Quest did not begin developing the test until March 2016. *See* Ex. G, 9/05/19 Tr., Docket No. 511-8, at 80:5-20 (explaining that preparation of the Idea, Proposal, and Solution Brief stages took "very little effort," and that "[t]he real effort happens when you actually start developing the assay and start doing wet work"); Ex. W, 9/11/19 Tr., Docket No. 511-24, at 33:18-24, 37:12-41:9. The "Launch Readiness" stage did not mean that Quest was actually anywhere near ready to launch the test on the market; Launch Readiness was a term for an internal stage at which research and development could begin. *See* Ex. G, 9/05/19 Tr., Docket No. 511-8, at 51:6-12. The June 2015 presentation

---

[3] The parties disagree as to when Quest began "development" of its IBS test. The disagreement largely stems from the parties ascribing different meanings to the word "development" − Quest uses it to mean "wet work," or scientific research on the test, while Cedars-Sinai uses it to encompass the larger planning process. Reply at 10. The dispute is largely irrelevant, as it essentially shows that the parties are in agreement that planning discussions for the test happened before publication of the Trade Secrets, but scientific development did not begin until after publication. The jury was free to credit this evidence in either direction.

to the Solution Priority Council did not mention Trade Secrets 1 and 3, and the Quest scientist initially tasked with developing an IBS test stated that she relied on publicly available information and never saw the manuscript containing the Trade Secrets.  Ex. Y, PTX-126, Docket No. 511-26, at -0656 – -0669; Ex. C, 9/04/19 Tr., Docket No. 511-4, 135:14-17.  Finally, the Court finds Cedars-Sinai's comparison of the six months it took for Quest to reach "Launch Readiness" with the 10-15 years it took Dr. Pimentel to develop his test to be something of a red herring: first, because "Launch Readiness" did not actually mean that the test had been created and was ready to be deployed, and second, because Quest admittedly relied on information that Dr. Pimentel had placed in the public domain in order to create the plans for its IBS test.

Based on the conflicting evidence offered by both parties, the Court is not inclined to find that Cedars-Sinai has demonstrated that the great weight of evidence shows that Quest used Trade Secrets 1 and 3 in its planning, preparation, and development of the IBS test between September 11, 2014 and May 13, 2015.

### ii.   _Alleged Use of Trade Secret 1_

Cedars-Sinai points to several pieces of additional evidence as showing that Quest improperly used Trade Secret 1.  This evidence largely centers on Quest's alleged use of Trade Secret 1 to obtain a cost estimate for the CtdB reagent.  _See_ Motion at 7-10.  Specifically, Cedars-Sinai highlights:

- A January 28, 2015 email from Dr. Naides to Quest's then-Scientific Director for Immunology R&D, Dr. Joanna Popov, asking: "Could you estimate costs per sample to run 2 ELISAs, one on antibody to CDT-B, a bacterial toxin, and the other on antibody to vinculin . . . CDT-B and Vinculin proteins can be bought commercially."  Ex. 11, PTX-0079, Docket No. 509-14, at -4234.

- A February 8, 2015 email from Ms. Ray, a former Director of Product Management for Quest, to the Quest internal team, asking: "Have you had any success revisiting the costs associated with us creating a LDT for IBS yet?" coupled with Dr. Naides' response stating: "it is off the shelf technology with commercially available reagents . . . it is the CDT-B and vinculin assays."  Ex. 12, PTX-0080, Docket No. 509-15, at -4270.

- An April 7, 2015 email from Ms. Ray to Mr. Plewman asking to "discuss . . . new numbers for IBS and Celiac" to present at Quest's June 2015 pipeline review.  Ex. 13, DX-1138, Docket No. 509-16, at -9309.

At the time of these emails, Creative Biosmart was the only commercial source of the specific CdtB required to run the IBS test. Ex. 3, 9/06/19 Tr., Docket No. 509-6, at 53:25-55:3. However, Creative Biosmart did not publicly advertise CdtB-01C until 2017. *Id.* at 55:4-7. Therefore, according to Dr. Christians, Cedars-Sinai's expert, the emails demonstrate Quest's intent to use Trade Secret No. 1 to perform a cost analysis and prepare for its IBS test. *Id.* at 53:25-54:13. And Cedars-Sinai argues that the April 7, 2015 email shows that Quest continued to rely on Trade Secret No. 1 through the planning process.

Here, Quest has offered evidence that the jury could have relied on to reach a different conclusion than the one put forward by Dr. Christians. In contrast to Dr. Christian's interpretation of the emails, Dr. Naides explained that he needed Ms. Popov to estimate a cost, and that Ms. Popov reminded him that Quest had performed a cost estimate in 2014 using a pre-existing assay. Ex. G, 9/05/19 Tr., Docket No. 511-8, at 84:1-24. According to Dr. Naides, Quest relied on this preexisting estimate for a similar assay rather than using the cost of Creative Biosmart's CdtB-01C to estimate costs. *Id.* Therefore, according to Quest, the emails show that Quest used a preexisting assay as a proxy to estimate costs, not that Quest improperly relied on Trade Secret 1 to estimate costs. *Id.* And while the April 7, 2015 email shows Quest's continued preparations for the IBS test, it does not say anything about Trade Secret 1.

Based on the conflicting evidence offered by both parties, the Court is not inclined to find that Cedars-Sinai has demonstrated that the great weight of evidence shows that Quest used Trade Secret 1 before its publication on May 13, 2015.

### iii. *Alleged Use of Trade Secret 3*

Cedars-Sinai also argues that the great weight of the evidence shows that Quest improperly used Trade Secret 3 before May 13, 2015. As before, Cedars-Sinai relies heavily on its expert's interpretation of various Quest internal communications. *See* Motion at 10-13. First, Cedars-Sinai points to a December 3, 2014 (pre-termination of the licensing discussions) email from Mr. Fleckenstein to Drs. Pimental and Gupta, stating that "[p]ost the NEJM data, we are looking [at] measuring both anti-vinculin and anti-CdtB in parallel." Ex. 16, PTX-0196, Docket No. 509-22, at -2573. Dr. Christians interpreted this email to mean that "at this point, the New England Journal of Medicine data [Trade Secret 3] had played a role in making the decision to go ahead . . . developing and implementing the assay." Ex. 3, 9/06/19 Tr., Docket No. 509-6, at 69:17-70:4. Additionally, on March 28, 2014, Mr. Fleckenstein, Ms. Ray, and Dr. Naides had a call with

Cedars-Sinai on IBS, in order to get more details from Cedars-Sinai.  Ex. 8, PTX-0764, Docket
No. 509-11, at 82:23-25, 83:5-19, 83:25-84:2, 84:13-16.  Mr. Fleckenstein noted during this call
that Quest obtained information from Cedars-Sinai about the 3,000 clinical trial specimens in
Cedars-Sinai's clinical studies for the IBS test.  Ex. 17, PTX-0178, Docket No. 509-23, at -3293.
Cedars-Sinai also points to an April 23, 2014 call in which Quest received information from
Cedars-Sinai showing the accuracy rate of Cedars-Sinai's testing of 2,536 Salix clinical samples.
Ex. 18, PTX-0181, Docket No. 509-24, at -2575.  Dr. Christians opined that the clinical validation
data from Trade Secret 3 were "critically important because they tell you if this assay works and
then, of course, it informs somebody who reads this if it is worth [it] to set up the assay and to go
through the efforts of planning the assay, and developing, validating, setting up the assay and then
implementing the assay."  Ex. 3, 9/06/19 Tr., Docket No. 509-6, at 62:3-22.  Finally, Cedars-Sinai
points to November 2013 Quest emails discussing Quest's interest in seeing additional "anti-
vinculin data," and Mr. Fleckenstein's offer to "give the Cedars-Sinai Technology transfer Office
a call and see if [he could] get more detail."  Ex. 19, PTX-0160, Docket No. 509-25, at -3236.
According to Dr. Christians, this exchange indicates that Quest was "aiming at getting the original
data" contained in Trade Secret 3.  Ex. 3, 9/06/19 Tr., Docket No. 509-6, at 68:11-69-1.

Again, Quest presents evidence that the jury could reasonably have relied on instead of
crediting Dr. Christian's interpretation.  For instance, Quest argues that the "data" discussed in the
November 2013 email thread was actually the data from a public presentation Dr. Pimentel had
given at a conference.  Ex. G, 9/05/19 Tr., Docket No. 511-8, at 18:5-19:1, 19:21-22, 73:4-21; Ex.
AA, DX-960, Docket No. 511-28.  Moreover, this email thread occurred long before Quest
obtained the confidential manuscript in September 2014.  Similarly, Quest highlights the fact that
Dr. Christians recognized that the determination and reporting of clinical results in Quest's IBS
test were "really different" from the Cedars-Sinai test, and that "there were differences in the terms
of how the clinical validation worked."  Ex. D, 9/06/19 Tr., Docket No. 511-5, at 100:24-103:13.
Quest argues that Dr. Christian's interpretation of the evidence was merely speculation, and that
there was no evidence presented that compelled the jury to find in Cedars-Sinai's favor.

The Court would find that Cedars-Sinai has not carried its burden of demonstrating that the
great weight of the evidence shows that Quest used Trade Secret 3 before its publication on May
13, 2015.  While the jury could have relied on Cedars-Sinai's evidence to find misappropriation,
it was also reasonable for the jury to credit Quest's evidence and find no misappropriation.

Therefore, the Court would not find that the great weight of the evidence shows that Quest misappropriated Trade Secrets 1 and 3 between September 11, 2014 and May 13, 2015. Because Cedars-Sinai has not shown that the great weight of the evidence falls in its favor on improper use, a required element of trade secret misappropriation, the Court is not inclined to grant the motion for a new trial or judgment as a matter of law on the issue of trade secret misappropriation. Nonetheless, the Court will briefly address the remaining factors of the trade secret misappropriation claim below.

### 4. Whether Cedars was Harmed or Quest Unjustly Enriched by the Improper Use

The next factor requires Cedars-Sinai to prove that it was harmed or that Quest was unjustly enriched by the alleged improper use.

#### i. *Harm to Cedars-Sinai*

First, Cedars-Sinai argues that it suffered harm from the alleged misappropriation because it lost the opportunity for a lucrative license with Quest during a critical window of opportunity. *See* Motion at 14-15. Dr. Pimentel testified that Cedars-Sinai expected the license to consist of a $5-10 million up-front payment and 12% royalty on sales of the IBS test. Ex. 1, 9/04/19 Tr., Docket No. 509-4, at 90:24-91:9. Dr. Pimentel testified that the IBS test would create revenue of $100 million per year for the company licensing it. *Id.* Cedars-Sinai asserts that it had a narrow window of opportunity to launch its IBS test. On December 3, 2014, Quest told Cedars-Sinai that it had a "strong continuing interest" in the IBS test. *Id.* at 117:2-10, 117:15-24. Cedars-Sinai faced a December 5, 2014 deadline to submit an abstract for the international Digestive Disease Week ("DDW") conference. *Id.* at 117:15-119:6. Submission of the abstract was expected to lead to the presentation of Dr. Pimentel's research at DDW and publication of the Trade Secrets. *Id.* Additionally, two IBS treatment drugs were about to receive FDA approval. *Id.* Therefore, "Cedars-Sinai and Dr. Pimentel therefore had to decide whether to submit the DDW abstract and reveal the secret recipe in reliance on their understanding from Quest that Quest would enter into a license with Cedars-Sinai and put the IBS test on the market during a critical time following the launch of two FDA-approved IBS treatment drugs." Motion at 15. Cedars-Sinai submitted the abstract to DDW, but Quest terminated licensing discussions on December 23, 2014. Ex. 1, 9/04/19 Tr., Docket No. 509-4, at 119:7-120:4.

The Court would agree with Quest that Cedars-Sinai has not demonstrated harm by the great weight of the evidence. First, Quest points to the fact that Cedars-Sinai actually rejected the

license proposal Quest made in May 2014, and Cedars-Sinai did not submit a counter-proposal. Ex. L, 9/09/19 Tr., Docket No. 511-13, at 23:4-7, 28:21-24.  And while Cedars-Sinai responds that it was "working on" a counter-proposal when Quest terminated negotiations in December 2014, the jury could reasonably have seen the fact that Cedars-Sinai did not submit a counter-proposal within 6 months of Quest's proposal as evidence that the license with Quest was not as much of a priority as Cedars-Sinai alleges.  Reply at 13.  Quest also points out that the test was a commercial failure because the underlying science was not sound, so royalty payments to Cedars-Sinai would have been minimal.  Ex. H, 9/10/19 Tr., Docket No. 511-9, at 19:4-19.  Finally, Quest points out that Cedars-Sinai obtained $5.6 million when the IBS portion of Commonwealth, the laboratory Cedars-Sinai ultimately licensed its test to, was bought by Valeant − an amount significantly exceeding the royalty payments generated by the IBS test.  Ex. E, 9/4/19 Tr., Docket No. 511-6, at 131:22-132:2.  Cedars-Sinai eventually terminated the license agreement with Valeant, reacquired its rights, and started a new for-profit company to market its IBS test.  *Id.* at 8:23-24, 9:20-23.

Based on this evidence, the Court finds that the jury could have reasonably concluded that Cedars-Sinai was not harmed by Quest's alleged trade secret misappropriation.  First, Cedars-Sinai has not demonstrated that it was *entitled* to a licensing agreement with Quest, or that the licensing agreement would have aligned with Cedars-Sinai's expectations, given that Cedars-Sinai had neither accepted Quest's offer nor submitted a counter-proposal.  Thus, while Commonwealth may be a smaller company than Quest, it is not possible to predict how a potential contract with Quest would have compared.  Second, Cedars-Sinai's argument here seems to have more to do with Quest's decision to terminate the licensing discussions than with the alleged misappropriation. Cedars-Sinai took a gamble in submitting an abstract to DDW after Quest expressed its continuing interest in the IBS test; while Quest subsequently terminated negotiations, Cedars-Sinai was still able to enter into a lucrative contract to license the test with another lab.  The great weight of the evidence does not show that Cedars-Sinai was harmed by Quest's conduct herein.

### ii.  *Unjust Enrichment to Quest*

Cedars-Sinai also argues that Quest was unjustly enriched, because the alleged misappropriation gave Quest a head start in putting its IBS test on the market.  According to Cedars-Sinai, Quest's acquisition of the Trade Secrets from the confidential manuscript allowed Quest to secure a specimen collection agreement with Commonwealth to cross-validate Quest's

IBS test.  Ex. 4, 9/06/19 Tr., Docket No. 209-7, at 9:2-21.  Dr. Christians testified to his belief that if Quest had waited until after the publication of the Trade Secrets to begin developing the IBS test, Quest would not have been able to perform the cross-validation with Commonwealth.  Ex. 3, 9/06/19 Tr., Docket No. 509-6, at 88:20-90:15, 91:9-92:2.  Further, Dr. Christians opined that if Quest had not been able to cross-validate with Commonwealth, it would not have been able to bring an IBS test to market.  *Id.*

Again, the Court would find that Cedars-Sinai has not proven that the great weight of the evidence falls in its favor on this issue.  While Quest chose to cross-validate with Commonwealth, Quest's expert testified that Quest was not *required* to do so in order to bring its product to market.  Ex. H, 9/10/19 Tr., Docket No. 511-9, at 112:25-113:3, 117:10-22, 128:23-132:16, 118:12-18.  Further, Quest points out that Quest allowed nine months to lapse between the time it obtained the confidential manuscript and the time it actually started lab work.  Ex. D, 9/06/19, Docket No. 511-5, at 76:9-78:7.  And Quest did not launch its test until thirty months after it received the manuscript.  *Id.* at 75:11-22.  Thus, a reasonable jury could have found that Quest was not unjustly enriched by its alleged misappropriation of the Trade Secrets.

### 5.  Whether the Use was a Substantial Factor in Causing the Harm or Unjust Enrichment

The final prong of trade secret misappropriation asks whether the alleged misappropriation was a substantial factor in causing the harm or unjust enrichment.  As above, the Court is not persuaded that the great weight of evidence compels a conclusion in Cedars-Sinai's favor on this factor.  Cedars-Sinai's arguments here focus on the alleged harm it suffered by not being able to enter a licensing agreement with Quest.  Cedars-Sinai explains that it "relied on Quest's representations that Quest was interested in licensing Cedars-Sinai's IBS diagnostic technology in deciding whether to present on and publish its trade secrets."  Motion at 17.  And in its Reply, Cedars-Sinai explains that it "was harmed because Quest falsely represented during licensing negotiations that it had 'a strong, continuing interest' in licensing Cedars-Sinai's IBS diagnostic technology."  Reply at 15.  However, the harm Cedars-Sinai describes appears to stem more from Quest's decision to terminate the licensing discussions than from the alleged misappropriation.  Moreover, as Quest points out, the parties never actually came close to reaching an agreement, and Quest had no obligation to enter into a license agreement with Cedars-Sinai.  *See* Opp'n at 18.  The Confidentiality Agreement specifically provided that it "shall not be construed to . . . imply any commitment by either party to purchase the other party's products or services or to enter into any

other business relationship." Ex. II, PTX-164, Docket No. 511-36, at -8871.  Therefore, the Court would not find that the great weight of the evidence demonstrates that the alleged misappropriation was a substantial factor in causing the harm or unjust enrichment.

Based on the foregoing discussion, the Court would not find that Cedars-Sinai is entitled to a new trial or judgment as a matter of law based on its trade secret misappropriation claims.

### C. Breach of the Confidentiality Agreement

Cedars-Sinai also argues that no reasonable juror could find that Quest did not use Trade Secrets 1 and 3 in violation of the Confidentiality Agreement.   Under the terms of the Confidentiality Agreement entered into by the two parties, Quest was only permitted to use Cedars-Sinai's "proprietary information" to assess whether to enter into a license for Cedars-Sinai's IBS diagnostic technology. Ex. 30, PTX-0164, Docket No. 509-41.

In order to win on its breach of contract claim, Cedars-Sinai had to prove the following elements:

1. That Cedars and Quest . . . entered into a contract;
2. That Cedars did all, or substantially all, of the significant things that the contract required it to do;
3. That Quest did something that the contract prohibited it from doing;
4. That Cedars was harmed; and
5. That Quest's breach of contract was a substantial factor in causing Cedars's harm.

*See* Jury Instructions at 5.  Cedars-Sinai bases its breach of contract claim on the same grounds as its trade secret misappropriation claims.  *See* Motion at 18-19.  Therefore, for the same reasons that the Court does not find that the great weight of the evidence shows that Quest misappropriated Cedars-Sinai's trade secrets, the Court also does not find that the great weight of the evidence shows that Quest breached the Confidentiality Agreements.  The Court would not grant a new trial or judgment as a matter or law on Cedars-Sinai's breach of contract claim.

### D. '877 Patent Application

#### 1. Summary Judgment

Before trial, the Court granted summary judgment in Quest's favor on the question of whether Quest had misappropriated alleged trade secrets that were contained in Cedars-Sinai's patent applications, including one that was referred to as the '877 Application.[4]  *See* Final Ruling

---

[4] Cedars-Sinai filed for a patent as to "methods for detecting the presence of irritable bowel syndrome and system for diagnosing same" on August 19, 2013, which later had a publication date of August 20, 2015, and was issued on July 11, 2017 with patent number 9,702,884.  The '877 Application refers to the Provisional Application No. 62/061,877

on Defendants' Motion for Summary Judgment, Docket No. 348, at 17-18 ("Cedars-Sinai does not, however, direct the Court to any *evidence* creating a triable issue on whether Quest misappropriated any trade secrets from the patents."). Cedars-Sinai now argues that a new trial is warranted because the Court's summary judgment on the '877 Application prevented Cedars-Sinai from eliciting testimony or inquiring at trial as to whether the '877 Application contained the trade secrets at issue.[5]  *See* Motion at 21.  Cedars-Sinai argues that it was foreclosed from raising evidence related to the alleged trade secrets in the '877 Application based on the Court's statement that "there are certain things that have previously been listed as trade secrets, and they can obviously be litigated or brought up but not as trade secrets . . . ."  Ex. 34, 8/29/19 FPTC Tr., Docket No. 509-46, at 18:1-4.

In order to obtain a new trial, Cedars-Sinai must prove both that the Court's evidentiary ruling was "erroneous" and that it "substantially prejudiced" Cedars-Sinai.  *Ruvalcaba v. City of L.A.*, 64 F.3d 1323, 1328 (9th Cir. 1995).  Here, the Court would find that Cedars-Sinai cannot meet this standard.  First, Cedars-Sinai has not actually shown that the Court made an "erroneous" evidentiary ruling.  The summary judgment ruling concerned what claims could be submitted to the jury, not whether Cedars-Sinai could present evidence relating to the '877 Application. Cedars-Sinai makes a somewhat perplexing argument that the summary judgment ruling prevented it from presenting any evidence relating to the '877 Application containing trade secrets, because such evidence became irrelevant once the patent claims could no longer be submitted to the jury. *See* Reply at 18, 18 n.7.  But this seems to contradict Cedars-Sinai's core argument that such evidence remained relevant as further support for its trade secret misappropriation claims.

And while the Court indicated in response to motions in limine that "certain things" could "be litigated or brought up . . . not as trade secrets but as the background stuff," it would be a stretch to say that the Court's statement prevented Cedars-Sinai from introducing any material evidence related to the '877 Application.  Cedars-Sinai points to a variety of evidence it would

---

which was filed with the U.S. Patent and Trademark Office prior to the '884 application.

[5] The parties disagree as to whether a motion for a new trial is an appropriate vehicle for Cedars-Sinai to raise arguments relating to the Court's summary judgment order.  The single case cited by Quest in support of its argument that Cedars-Sinai may not challenge the Court's summary judgment ruling in this way is inapposite, because it involved an instance where no trial had occurred. *See Berndt v. City of Los Angeles*, No. CV-11-08579-GAF(AJWX), 2013 WL 12075979, at *3 (C.D. Cal. June 6, 2013) ("Plaintiff's motion for a new trial is nonsensical because no trial was ever conducted in this action.").  In the absence of any authority supporting Defendants' position, the Court will consider Cedars-Sinai's arguments under its motion for a new trial.

have liked to present related to the '877 Application, but some of this evidence (including the '877
Application itself) actually was admitted, and others Cedars-Sinai never actually moved to admit.
*See* Opp'n at 21.

More importantly, even assuming the Court made an erroneous evidentiary ruling, Cedars-
Sinai has not demonstrated that it suffered substantial prejudice as a result. Cedars-Sinai argues
that it was prejudiced by not being able to introduce certain communications regarding the '877
Application, because, according to Cedars-Sinai, the '877 Application contained the trade secrets
at issue. According to Cedars-Sinai, Quest's possession of the '877 Application meant that it had
"an additional point of access to, and motivation to misappropriate, three of the four trade secrets
at issue." Reply at 19. However, Quest did not receive the '877 Application until October 2014,
one month after it had already received the confidential manuscript containing Trade Secrets 1 and
3. Opp'n at 21. Therefore, the jury was aware that Quest had "access to" Trade Secrets 1 and 3
regardless of the '877 Application. Cedars-Sinai has not pointed to such quantity or quality of
evidence that the Court is persuaded Cedars-Sinai was substantially prejudiced by it not being
included. *See* Motion at 21-22. Rather, Cedars-Sinai points to emails containing a copy of the
'877 Application and several emails between Quest and Cedars-Sinai employees discussing the
'877 Application. *Id.* None of these emails demonstrate that Quest improperly used Trade Secrets
1 and 3 − even if contained in the '877 Application − in developing Quest's IBS test. And while
Cedars-Sinai repeatedly argues that the evidence would have shown additional "motivation" for
Quest to misappropriate the Trade Secrets, Cedars-Sinai never explains how being sent the '877
Application would have motivated Quest to misappropriate the Trade Secrets, when Quest already
had access to them through the confidential manuscript. The Court is therefore not inclined to find
that Cedars-Sinai was substantially prejudiced by exclusion of evidence as to whether the '877
Application contained trade secrets.

Cedars-Sinai makes several additional arguments, none of which convince the Court that a
new trial is necessary. First, Cedars-Sinai argues that the exclusion prejudiced Cedars-Sinai's right
to a fair trial "because it was prevented from offering evidence to rebut a main theme of Quest's
case-in-chief," that "earlier patent publications contained sufficient information for Quest to create
an IBS test." Reply at 19. This argument is unpersuasive: the fact that the '877 Application
supposedly contained trade secrets does not negate the fact that other, published patent applications
contained information that Quest could have used to create the IBS test. Put differently, the fact

that Quest relied on published patent information to create its IBS test does not mean that Quest relied on confidential information contained in the unpublished '877 Application to create the test. Second, Plaintiff argues that it was substantially prejudiced by the exclusion because it was "hamstrung" from correcting Dr. Naides' incorrect testimony that Quest had received three, rather than four, patent applications from Cedars-Sinai. Motion at 23. But as the Court has already pointed out, the '877 Application was admitted as evidence, and Cedars-Sinai's counsel actually asked one of Quest's witnesses a question about the '877 Application. Ex. L, 9/9/19 Tr., Docket No. 511-13, at 84:2-10. Given that the '877 Application was admitted as evidence, Cedars-Sinai certainly could have corrected Dr. Naides' statement that Quest had only received three patent applications from Cedars-Sinai.

Because the Court is not persuaded that it made an erroneous evidentiary ruling that substantially prejudiced Cedars-Sinai, the Court is not inclined to grant a new trial based on the exclusion of evidence that the '877 Application contained trade secrets.

### 2.   Quest's Closing Statements

Next, Cedars-Sinai argues that the Court should grant a new trial because Quest's counsel made improper, prejudicial statements during closing arguments. "A new trial [based on attorney misconduct] should only be granted where the 'flavor of misconduct . . . sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.'" *Settlegoode v. Portland Pub. Schs*, 371 F.3d 503, 517-18 (9th Cir. 2004) (quoting *Kehr* v. *Smith Barney*, 736 F.2d 1283, 1286 (9th Cir. 1984)) (alterations in original); *Standard Oil Co. v. Perkins*, 347 F.2d 379, 388 (9th Cir. 1965). Here, because Cedars-Sinai did not object to the statements during trial, Cedars-Sinai faces the even "higher threshold" of plain error review. *Id.* at 518. "Plain error review requires: (1) an error; (2) that the error be plain or obvious; (3) that the error have been prejudicial or affect substantial rights; and (4) that review be necessary to prevent a miscarriage of justice." *Id.*

The allegedly improper statements that Cedars-Sinai points to here are Quest's statements during closing arguments that the patent applications did not contain trade secrets. *See* Ex. 44, 9/11/19 Tr., Docket No. 509-56, at 140:16-18 ("[E]verybody agrees that there are no trade secrets in the patent publications."), 147:23-148:1 ("But again, not one of the trade secrets, and then, as I said, nothing in these patent applications or publications or trade secrets either. Everybody agrees with that."), 138:5-7 ("There is nothing in this case . . . in which Quest could be accused of doing

anything wrong by using the recipes that were in the patent application."), 171:17-19 ("[Quest] said it won't take a license for the patent applications, had nothing to do with trade secrets."). Cedars-Sinai argues that these statements were false because the '877 Application actually did contain trade secrets. *See* Motion at 24.   The Court does not find that these statements during closing argument so permeated the whole trial to conclude that a new trial is necessary.   As Quest points out, it did not mention the '877 Application in any of these statements.   Further, the statements were made to support Quest's argument that the three published patent applications contained sufficient public information for Quest to create its IBS test without needing to rely on the Trade Secrets. *See* Ex. W, 9/11/19 Tr., Docket No. 511-24, at 135:16-136:5.   For the same reason that Cedars-Sinai cannot prove that exclusion of evidence relating to trade secrets in the '877 Application was substantially prejudicial above, it cannot prove prejudice from that the statements during closing arguments that the patent applications did not contain trade secrets. Simply put, Cedars-Sinai cannot prove that an error occurred that prejudiced Cedars-Sinai such that review is necessary to prevent a miscarriage of justice.   Therefore, the Court would not grant a new trial based on Quest's statements at closing arguments.

### E. Final Verdict Form

Finally, Cedars-Sinai argues that a new trial is necessary because the verdict form was not finalized before closing arguments.   It argues that this failure "denied [it] the opportunity to deliver a zealous and meaningful closing argument."[6]  Motion at 24.

The Ninth Circuit has held that: "The form of the verdict should be decided before closing argument so that counsel may structure their arguments, and the court its instructions, accordingly. The failure to follow this practice may constitute reversible error." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1374 (9th Cir. 1987) (internal citation omitted).   However, the Ninth Circuit has repeatedly declined to order a new trial under similar conditions.   For example, in *Galdamez v. Potter*, 415 F.3d 1015, 1026 (9th Cir. 2005) a plaintiff argued that she was prejudiced when the verdict form was changed after submission to the jury because she was deprived of the opportunity to address the verdict form in closing arguments.   The Ninth Circuit found that "any error in the timing of disclosure was harmless," because the plaintiff had not

---

[6] Initially, the Court would note that the failure of having a final version of the verdict form ready prior to the closing argument was basically due to the parties' inability to agree on a version beforehand. *See e.g.* 9/11/19 Reporter's Transcript at 181-86, Docket No. 502.

explained "how her closing argument would have been different had the subject of the revised form been disclosed in order for her to make adjustments." *Id.* at 1026-27.   Similarly, in *Ruvalcaba v. City of L.A.*, 167 F.3d 514, 521 (9th Cir. 1999), the district court informed the parties of the substance of special interrogatories after closing arguments were completed.   The Ninth Circuit found that the error was harmless and the plaintiff had not been prejudiced, because the plaintiff had not shown how his arguments would have been different in the absence of the changes. *Id.* at 522-23.   The same is true here.   Cedars-Sinai argues that it would have "walked the jury through" the verdict form, but that does not actually show how the substance of Cedars-Sinai's closing arguments would have been different based on the verdict form that was ultimately used.   Reply at 25.   As in *Ruvalcaba*, the verdict form did not contain any substance that should have been surprising to Cedars-Sinai.   *Ruvalcaba*, 167 F.3d at 522.   Further, Cedars-Sinai and Quest were equally affected by the inability to walk the jury through the verdict form.   Therefore, the Court does not find that the late submission of the verdict form harmed Cedars-Sinai such that a new trial is necessary.

## IV.    Conclusion

As stated by Plaintiff's counsel at the start of his closing argument: "This is a complex case, and you've heard conflicting opinions and references. We know that much of your job is here is to determine which opinions are credible, more believable, more reliable." *See* 9/11/19 Reporter's Transcript at 96, Docket No. 502.   In that regard, Plaintiff's counsel was certainly correct.   The jury undertook the task of resolving the conflicting, evidence, opinions and references, and, in the course of doing so, made credibility determinations.   Under the applicable law, the Court would not find that there is a basis for overturning the jury's verdict and/or granting a new trial.

Based on the foregoing discussion, the Court would **DENY** the motions for a new trial and judgment as a matter of law.